Ladies and gentlemen, this court is now in session. Good morning, all. Everybody can be seated, please. All right, Lisa, call the case, please. 14-2740, People v. Rickery-Sandifer. All right. When the attorneys identify themselves to the record, we'll give you 15 minutes for oral argument. Good morning, Your Honors. My name is Annie McLennan from the First District Office of the State Appellate Defender, and I represent Gregory-Sandifer. Did you guys reserve some time for rebuttal, Miss? A brief rebuttal. How long?  Great, thank you. Good morning, Your Honors. My name is Farina Megani-Wakely, representing the People of the State of Illinois. All right, thank you. Miss Wakely, you can have a seat. Miss McLennan, you can begin. So we've raised three issues, and I'd like to focus on the first issue, that the trial court erred in denying Gregory-Sandifer's motion to suppress the statements. He was under the influence of serious pain medication and in severe pain when he gave these statements, making them involuntary. Miss McLennan, isn't that a question of fact for the trial judge to determine, based on the witness' testimony and the video in this case, on whether he was capable of understanding and giving responses to the question? Isn't that a question of fact for the trial judge? Well, it is a question of fact for the trial judge. However, we do have the video, so we can apply a de novo review to the video. I see. Because you guys can look at it the same way the trial judge can look at it. It's before you. What case would suggest that, because there's a preserved videotape, that the standard of review changes from manifest weight to de novo review? Well, the legal question of whether the statement was involuntary is manifest weight. I didn't mean to suggest that. The factual question. Historical fact. I'm sorry. The factual questions are reviewed under manifest weight of evidence, and the ultimate question is a de novo review. So the test here is whether the statement was made freely, voluntarily, and without compulsion or inducement of any sort. Sandifer was weakened by the pain and the drugs, and his will was overborne by these factors, so that he couldn't make a voluntary statement. His ankle was shattered, and because of the pain from his injury, he received multiple doses of medication. Over the course of the afternoon and evening, he gave four statements, and during his time, the hospital administered four doses of morphine and one dose of Dilaudid, and these doses of medication impaired his judgment. So would you say that just as a matter of course, the fact that he received this much medication automatically makes his voluntariness of his statement suspect? So nothing is automatic here in these situations. They're all different. But I think it does – you do have to examine it, because that was a lot of medication. We're not arguing that all statements are involuntary when pain medication is given, but in this particular circumstance, there was so much pain, the statement was involuntary. So we should – if that's the position, that there was so much medication given, why do we even have to look at the videotape? Why wouldn't we just take the testimony of the nurse who administered it and take the look at how much morphine and Dilaudid or – Dilaudid. Thank you. Whatever. It was a D word. Dilaudid. Yes. Why wouldn't we just look at the amount of medication that was given and say, eh, nobody could really be – have the presence of mind to give a voluntary statement at that point? You know, if you'd like to look at it that way, I really can,  where the X amount of medication is going to make a statement. Okay. So if there's no broad line, then why wouldn't the trial judge be well within his discretion to look at the videotape, look at how he's responding to questions and say, hey, that's sufficient? Well, I think when you look at everything together, it was an error. It was the wrong decision. I mean, you have the nurse testifying how strong these medications are. They bind to receptors in the brain and affect the central nervous system. Didn't she give other testimony that would support that he understood what was going on? So her testimony talked about the seriousness of the medication, and she talked about the side effects, but we have to remember that she wasn't focusing on whether he could legally, you know, waive his rights or legally give a voluntary statement. She's focusing on, you know, the lab reports, his renal function, and things like that. So we have to look at her testimony to understand how serious the medication was, but also understand that she isn't talking about the legal standard, about whether he can voluntarily give a statement. You know, the state in their response brief says that if there was an error, it would be harmless beyond a reasonable doubt. Did you want to respond to that, or do you believe they're incorrect when they say that? Is the standard something different than an involuntary confession always warrants reversal? So when you look at Arizona v. Fulminante, it's discussed in the brief a little bit, and the court says the omission of an involuntary statement is not structural error. So it's not automatically reversible, but it is more devastating than other trial errors. So when we're doing the harmless error analysis, we do have to take that into consideration. So is that a correct standard, then? This is a harmless error review? Harmless beyond a reasonable doubt. However, involuntary confessions that are admitted are more devastating than other trial errors. So it's not quite structural error, but it isn't your average trial error. Well, then let's assume we're going to say the confession was involuntary, just for purposes of our argument. How do you respond, then? This is a case with other evidence, isn't it? It's not absolutely a confession case. You know, we acknowledge that there is a lot of evidence, but again, confessions are the most damaging type of evidence. But unless you have the victim testifying, you have eyewitnesses testifying, you have all of the weaponry recovered, you have the defendant cowering in a garage somewhere, there's a significant amount of evidence. How much could this confession really have swayed the jury? Not to mention the extensive DNA analysis. And again, we acknowledge that there was a lot of evidence, but we don't want any trial tainted by involuntary statements. And we can't say beyond a reasonable doubt that four statements had no effect. So if we gave you a new trial here, is the result going to be any different? Without the statements, we can't say beyond a reasonable doubt that it wouldn't be different. Why is that? Because involuntary confessions are so devastating. They are, you know, the strongest evidence that there were four of them. Other than the victim and the multiple eyewitnesses statement, you think that confession is stronger evidence than that? I think traditionally we've looked at confessions as, yes, the courts look at it as the most devastating, especially when there's four of them. Could there be any other result than the result that this Court gave? I think we can say beyond a reasonable doubt that without the confessions. What was the defense? What was the defense in this case? I think the defense was the State not proving beyond a reasonable doubt that he did everything. Okay. That he committed the offenses. And who did commit the offenses? I'm sorry, what was that? Who did commit the offenses? Well, you know, with the confessions, four confessions, he said he did. But, you know, we still have to hold the State to their burden. And without those confessions, we can't say beyond a reasonable doubt that, you know, there will be another guilty verdict. May I just interrupt you? What was the context of the first statement? That was simply a police officer guard. Now, his testimony was that he was the conversation was initiated by the defendant, not by that guard. And I don't know, you would know probably better. At that point, had the nurse already indicated that he was well? That nurse didn't see him until after that confession. So had he had any pain medicine? He had two doses. Two doses? No, one dose. Before the officer said he initiated the conversation. One dose. One dose. And the nurse didn't see him until after the second statement. And he got his second dose after the second statement. Are there cases that suggest that if a person is in pain, that they would be more apt to give a statement? Or are the cases that you rely on cases where medication can blur and change the effect of the person's mental abilities to voluntarily give a statement? Well, I think there's both. In Minnesee v. Arizona, there was pain. I mean, there was medication in Kincaid. I think it's both things working together, and they're not separate here. You look at all the characteristics, and, I mean, those are the characteristics. But are there any cases out there that say when someone's in pain, forgetting about getting medication, that because they've been injured, they're more likely to give a confession? Well, I mean, in Minnesee v. Arizona, he was, you know, seriously wounded, and they found that the confession was involuntary. Without the introduction of pain medication? I mean, he did have, you know, tubes and needles and a breathing apparatus, but they didn't discuss, you know, that the pain medication was the cause of involuntary confession. Ms. McClanahan, did you want to talk about the sentence before you lose your time? Unless you have any questions, I think I would rest on the briefs with that. So just briefly touching on the video as I have a little bit of time. So in the video, I think this is the most compelling piece of evidence we have here, and it's direct evidence of his condition and demeanor and manner. In the video, he's staring off into space. He has a really low voice. The assistant state's attorney has to tell him to keep his voice up. At one time, he says his eyes are closed because he's going to a different world. She's telling him to, you know, keep his eyes open. He's grabbing his head, saying his head hurts. He says the medication makes him want to speak faster. And at the end, when the assistant state's attorney asks him, is there anything else you want to say, and he says, no, I just want more pain medication.  In conclusion, Gregory Sanford's will was simply overborne by the pain and the medication. His statements were involuntary and should have been suppressed. We ask that you reverse and remand for a new trial without these statements. Thank you, Ms. McClellan. Ms. McGowan-Glakely? Is your standard, do you believe that your standard is accurately stated, that this is a review of harmless beyond a reasonable doubt? Yes. And that there is no question that Illinois law and federal constitutional law support that statement? Yes. And you have argued alternatively that if there was error committed, not that you're suggesting there was, but you have argued that under that standard of review, the error would be harmless beyond reasonable doubt. Why don't you tell us why you believe that the evidence supports that alternative argument in the event that this Court were to conclude that there was an error? Absolutely. And, of course, with no concession that any of the statements were not properly admitted. And on that point, I also want to note that it's not a domino's effect. You know, if you look at the videotape statement and should this Court find that it was involuntary, there still has to be an inquiry regarding all the other statements that were admitted in. Yes. There were different totalities and circumstances. So, again, with that caveat, I'll go on to the harmless error. Absolutely. Even without the statements. The statements in this case were just a little piece of the evidence against the defendant. I mean, here you had one of the victims, Margaret, testifying. She positively pointed to the defendant and said, that's the man that did all of this stuff to me inside the apartment, chasing her, raping her, throwing her out the window, stabbing her. And then she also testified that he, when she unfortunately left from the window, that he was in the apartment with Javon, three-year-old Javon. Then you had the testimony of the officer that went through the threshold after being told what was going on and sees the defendant with the knife, which ultimately has Javon's blood on it, holding that knife with Javon on the floor. He had been stabbed to death, stabbed hard enough that he was almost decapitated. And then you had this officer, same officer, testifying. The defendant flew up, fled out the window, or I'm sorry, the back door. And so you had quite evidence. You had two eyewitnesses, Mr. Ferguson and Mr. Johnson, who actually saw the defendant at the window where Margaret was hanging on at the sill, holding a knife and stabbing at her. And then you also had DNA evidence regarding Javon's blood on the knives, the butcher knives that were recovered. They were all there, Javon and Margaret's blood on defendant's shirt. He was bloody. His hands were bloody. His shirts were bloody when he was found in that garage. And again, like I said, there was quite evidence. I mean, the evidence, again, aside from the four statements, is simply overwhelming. And this is the case where harmless error, should it be applied, is absolutely saying that the results would not have changed. Let's go on to the statement just briefly. I understand your harmless error argument. But is there anything about the amount of painkillers he was giving that should give us pause with regard to the voluntariness of the statement? Absolutely not. I mean, first, again, defendant would like to collapse all of the doses that were given. And let's put them in perspective. He was given doses at increments over the time period that after he was captured to the time that he gave the videotape statement. So it wasn't like he was given one major dose. And then you do, should look at, just like the trial court did, the testimony of the registered nurse who was monitoring defendant's progress, his cognitive as well as his motor skills, after he was given these doses. So she testified, didn't she? She testified, and she testified clearly, not only regarding the side effects and what the medication was, she testified to their half-life, the kick-in, the five minutes. And she also testified, and the most important testimony she gave was she assessed the defendant three separate times for his mental capacity, his cognizance, after being given these doses. For example, she... What about when the first officer came? The first guarding officer. What was the amount of medication? Yes. The first statement was given at 1.15, and he had been given one dose of morphine at 12.16, an hour earlier. But, again, nurse Burtado tells you defendant's reaction to the doses. For example, she testified that her first assessment was at 4.30. When defendant was now on two doses of morphine. And at that time, with two doses, he was alert, cognizant, capable of... But wasn't there also an indication that he was still in extreme pain, and that's why she made a request for the other... The D word? The D that medicine often pronounces. I apologize, but... Well, yes, Your Honor, and that was at 6.15, prior to the third statement to the assistant state's attorney, as well as to the detective, the oral statement. But, again, he was in pain, but pain does not equate with the inability to give a voluntariness or knowing statement. And in here, based on the totality of the circumstances that the trial court received at the hearing, it was clear that there's absolutely no doubt that he was in pain. I mean, after killing his son, he ran out the back, jumped down two flights, and broke his ankle. Yes, a broken ankle was going to cause pain. And that's why he was being treated with the medicine at increments. But this wasn't a broken ankle. This was a shattered ankle. He shattered his ankle. And, yes, he was in pain because of that. But, again, he was being treated for it. And even in his pain, and there was no indication that it was preventing him from knowing what was going on and from giving a voluntary statement, when one just looks at what he was saying. And I would direct this Court's attention not only to the fact that he was consistent throughout his four statements, but I would direct the Court's attention to what he did say in order to minimize his actions in this case, which showed a clear, cognizant knowing of what the consequences of what he was saying. But what was he doing to minimize? For example, in his first statement to the detective, he said, I only stabbed Margaret once. And then later throughout the statements, he admitted, consistent with the medical evidence, that he stabbed her several times. I mean, he said he tried to minimize why he did this to Margaret. And he said, well, she came at me first. She hit me with the hammer. But, of course, Margaret did testify. That's not how it happened. I mean, and when you look at all the... Was there a hammer there? Not that I read in the record. I don't believe I did either. Yeah. So, and then, you know, the best, and, again, the saddest, actually, was when he tried to blame Margaret for what he did to his son. And he's like, she told me to take him with me. And that's what I did. So were there statements during the incident that Margaret related about the conversations they were having during this... I don't want to put a noun on it. During the whole incident of the... And they were offenses. Well, the evidence that was presented at trial, ultimately, regarding what happened, recounted by Margaret, was absolutely consistent with what defendant was saying happened, other than, of course, those attempts that he made in trying to minimize his own actions. But throughout his four statements, he never denied that he did this to Javon. He never denied that he attacked Margaret. Was there evidence of prior physical abuse in this case? There was, wasn't there? Yes. There was a motion to eliminate and keep out the evidence, and then the court allowed certain evidence in? Yes, allowed in a November episode that had occurred when the two were dating, where he had come over to... And, again, I'm going by what I recall in my brief, too. When he had gone over to visit her while she was staying at her parents' house and then had proceeded to throw her down the stairs and the police were called, he was arrested for that. And that particular incident was allowed in by the trial court. And so, again, going back to the totality of the circumstances, there is absolutely no evidence in this case that the pain medication detracted from him giving a voluntary or a knowing statement. There is no per se rule that a statement can be made involuntary just by the mere fact that you're being given medication. Again, the pain that he was in was, yes, he was in pain. He had his eyes shut, but as he admitted, he liked to talk while his eyes were shut. And as you'll see on the video, while his eyes were shut, he was giving great detail about what happened. Conversations, what happened at the school, what happened afterwards. I mean, with eyes closed. He was going through what happened. And then, you know, his demeanor, it was definitely, you know, one of resignation. I mean, he was admitting what he did to his three-year-old son. Again, the trial court's ruling in this case was absolutely correct and should be affirmed by this court. Thank you. Ms. McLennan. I have a very brief rebuttal. So first of all, just to clarify, the doses, there were four doses of morphine and one of Dilaudid. And the time period starts at 12-16 and ends at 10-45. So these were a lot of doses over a short period of time. And then my second and final point is that he did get one dose of morphine before his first statement to Officer Adams, which was the first statement. But we can't forget that it's not just all the pain medication. It's also the pain that he was in, which I think is, you know, most evident in the video here. If there's any other questions, I ask that you reverse and remand without these statements. Thank you. Thank you. Court will take the matter under advisement and issue an order as soon as possible. Thank you.